## ATLANTIC COAST LINE R. CO. v. STANDARD OIL CO. OF NEW JERSEY.

## SEABOARD AIR LINE RY. CO. v. SAME.

(Circuit Court of Appeals, Fourth Circuit. April 14, 1926.)

Nos. 2441, 2442.

Commerce ☞34—Interstate character of shipments of oil held terminated by storage for reshipment to substations and customers, so that subsequent shipments within state were subject to intrastate rates.

Interstate character of shipments of oil from oil company's refineries by its own vessels to its storage plant, to be there stored and reshipped to substations and customers, at such times and in such quantities as business should demand, *held* terminated by such stoppage and storage, so that subsequent shipments from such plant to points within state were subject only to intrastate rates, notwithstanding further movement was contemplated when shipment was originally made.

Appeals from the District Court of the United States for the Eastern District of North Carolina, at Raleigh; Isaac M. Meekins, Judge.

Separate suits by the Standard Oil Company of New Jersey, a corporation of New Jersey, against the Atlantic Coast Line Railroad Company and against the Seaboard Air Line Railway Company. Decrees for complainant (6 F.[2d] 911), and defendants appeal. Affirmed.

This is an appeal in equity from a decree granting an injunction in two suits instituted by the Standard Oil Company of New Jersey, hereinafter called complainant, against the Atlantic Coast Line Railroad Company and the Seaboard Air Line Railway Company, hereinafter called defendants, to restrain them from assessing other than the intrastate rates, approved by the North Carolina Corporation Commission, on the shipments of gasoline and refined oil by complainant from Wilmington over intrastate routes to other points in the state of North Carolina. The two suits present the same issue, and were heard together. The only point involved is whether the defendants should apply to the shipments in question the interstate rate filed with the Interstate Commerce Commission, or the intrastate rate approved by the state Corporation Commission. This depends upon the nature of the traffic, as to the facts of which there is little if any dispute. These were correctly stated by the District Judge as follows:

"Complainant refines gasoline and oils at its refineries at Charleston, S. C., Baton Rouge, La., Baltimore, Md., and other places, and carries the products in its own tank vessels to Wilmington and other ports along the Atlantic seaboard. At Wilmington it maintains an elaborate plant for the transfer of these commodities from the vessels, for the storage thereof and for selling them to customers throughout the state of North Carolina.

"The Wilmington plant, which is located approximately one-third of a mile from Cape Fear river, consists mainly of 6 large storage tanks, 4 for gasoline and 2 for refined oil, with an aggregate capacity of between 5,000,-000 and 6,000,000 gallons, together with 23 small tanks for lubricating oils, 2 warehouses of brick construction where various commodities are stored and where some of the products are barreled. The defendants serve the

plant of the complainant with their own rails.

"Upon the arrival of a vessel, the gasoline or refined oil is pumped into the storage tanks through various pipe lines maintained for that purpose, and the commodities are there held awaiting sale to complainant's customers or transfer to substations maintained by complainant in various parts of the state.

"Distribution of these commodities from the Wilmington plant takes several forms. The principal movement is in tank cars, leased to complainant by a private car company, but hauled in common carrier service by the defendants. Some shipments are made in barrels loaded in box cars. Defendants are not now charging, and have not sought to charge, interstate rates on these barrel shipments. And other distribution is made by tank wagons to customers in Wilmington and nearby territory.

"Wilmington is one station within the jurisdiction of what complainant designates as its Charlotte branch, which embraces most of the state of North Carolina. These stations are supplied not only from Wilmington, but, as occasion may require, from Norfolk, Va., Charleston, S. C., and other points at which complainant stores its products. A substation which to-day receives its supplies from Wilmington may to-morrow receive them from Norfolk. During the two years prior to the hearing there were 231 such 'transfers' of stations from one supply point to another, and there have been as many as 35 such transfers at a single time. The executive offices of complainant in New York, N. Y., and Baltimore, Md., determine from time to time the source of supply for the several stations in the Charlotte branch; this matter not being within the jurisdiction of the Charlotte branch manager or the manager of the Wilmington plant. This indicates that when the products arrive at Wilmington their destination is not definitely known, and this is confirmed by the testimony.

"The quantity of these products handled annually through Wilmington is very large. The receipts at Wilmington during the year 1923 were over 39,000,000 gallons. From 250 to 300 cars of these products are shipped from Wilmington monthly.

"Complainant has between 15,000 and 20,000 customers in North Carolina who receive these products, chiefly through complainant's substations. Complainant has 136 'carload customers,' to some of whom tank car shipments are made directly from the Wilmington plant, and others to whom delivery is made through the substations, the customer in this instance calling for the products with his own trucks. In the state of North Carolina there are 550 'drive-in' service stations and about 1,500 garages; only 2 per cent. of the total being owned by the complainant. There are between 9,000 and 10,000 small purchasers, such as grocery stores, and hardware stores, who are supplied largely by truck from the substations or from the Wilmington plant. In 1922 over 200,000 gallons of refined oil were sold to the United States government, which moved over defendants' rails in the government's own tank cars. Of the tank cars shipped to complainant's own substations and to independent customers in 1923 from the Wilmington plant 14 per cent. went directly to the independent customers. The quantity distributed locally from the Wilmington plant to nearby territory, largely by tank wagons and trucks, amounted to about 2,500,000 gallons in 1923.

"It is apparent from the nature of the business that it is not known at any given time to what destination a particular quantity of these products will ultimately go. It is not until after an order is received at Wilmington that the destination of a particular shipment can be determined. The manager of the Wilmington plant stated: 'I know when I receive this oil (at Wilmington). I hold it in the warehouse and the tanks until I receive orders to ship it out.'

"When the vessels leave Charleston or other refining point of complainant it is not known to what ultimate destination any particular part of the cargo will, in the course of time, be shipped from Wilmington. The products are for the first time committed to a common carrier when shipped from the Wilmington plant to interior points in North Carolina.

"At each of the substations in the state of North Carolina the complainant has small tanks for gasoline and other petroleum products from which distribution is made largely in tank wagons to customers in the surrounding territory.

"Complainant's branch manager at Charlotte receives 'stock reports' from time to time showing the quantities of the product on hand at the several substations, and when in his judgment it is desirable to do so, he orders shipments to be made from Wilmington to the several substations. One of the objects of the Wilmington plant is to have the products on hand ready for use when and where needed.

"The history of the rate adjustment shows that for 9 or 10 years prior to September, 1923, it was the custom of the defendants to

apply intrastate rates on this traffic. Prior to 1914 both the state and interstate rates were on the same basis, with the result that no question arose at that time regarding the character of the shipments. On August 13, 1914, the then Governor of the state of North Carolina signed an order requiring the railroads in North Carolina to make effective within 60 days an intrastate basis of rates which were in some instances lower than the corresponding interstate rates. The railroads promptly complied with this order, and the railroads continued to apply the intrastate basis of rates from October, 1914, to September, 1923, when, to use the words of one of their witnesses, the defendants in this case 'apparently concluded that they were entitled to collect on the intrastate basis.'

"The record shows that the receipts of gasoline and refined oils at Wilmington are quite irregular, varying widely from month to month. In June, 1923, for example, the gasoline receipts were nearly 5,000,000 gallons, whereas in October they were less than 2,000,000. In January, 1923, the receipts of refined oil were about 500,000 gallons, while none were received in February, and in March there were received over 1,000,000 gallons. Marketing and business conditions govern complainant's executives in determining whether the stocks at Wilmington should be kept high or low. This matter is not within the jurisdiction of any of the complainant's representatives in North Carolina. The Baltimore office of complainant is kept advised of the situation, because the branch manager at Charlotte makes regular reports to the division manager at Baltimore of the sales in the Charlotte district, and complainant's Wilmington agent in like manner makes reports of his stock on hand to the branch manager at Charlotte, to the division agency at Baltimore, and to the New York office.

"On May 1st of each year the complainant pays a local property tax upon the inventories of the Wilmington plant, including the gasoline, refined oils, lubricating oils, and other commodities on hand in the storage tanks and warehouse at that time, and this has been done for many years in the past. Complainant insists that these taxes could not be levied if the products, in contemplation of law, were moving in interstate commerce.

"Freight charges on the shipments from Wilmington are either prepaid by the complainant or are paid by the customers or by the complainant's substations, but when paid by the customers the freight charges are deducted from the invoice so that the complainant ultimately pays and bears the freight charges. The differences between the charges paid and those which could have accrued on the intrastate basis exceed $3,000 annually against each of the defendants."

Frank W. Gwathmey, of Washington, D. C., and Thomas W. Davis, of Wilmington, N. C. (Murray Allen, of Raleigh, N. C., and C. P. Reynolds and James F. Wright, both of Norfolk, Va., on the brief), for appellants.

Charles McH. Howard, of Baltimore, Md. (Edward F. Johnson, of Baltimore, Md., George H. Tower, of New York City, and James H. Pou, of Raleigh, N. C., on the brief), for appellee.

Before WADDILL, ROSE, and PARKER, Circuit Judges.

PARKER, Circuit Judge (after stating the facts as above). The question to be determined in this case is whether rail shipments of gasoline and refined oil, made by complainant in tank cars from its storage plant at Wilmington, N. C., by intrastate routes, to its local stations and tank car customers at other points within the state of North Carolina, are shipments in intrastate or interstate commerce. It is admitted that the oil thus shipped from Wilmington is brought to that city from Charleston, S. C., and Baton Rouge, La., by tank steamers of complainant, and that this transportation from Charleston and Baton Rouge is a movement in interstate commerce. The question is whether this interstate movement ends at Wilmington, or whether it continues, and characterizes as interstate commerce the shipments from Wilmington to other points in North Carolina. Defendants contend that it does so continue; that the shipments made by complainant from Charleston and Baton Rouge are not, in reality, shipments to Wilmington, but to complainant's substations and tank car customers within the jurisdiction of its Charlotte branch; and that the transfer from steamer to tanks, and from tanks to tank cars, at Wilmington, is a mere incident in the transportation, which does not destroy its interstate character. The contention of complainant, on the other hand, is that the shipments from Wilmington are entirely separate and distinct from the shipments to Wilmington; that Wilmington is a distributing point to which its oils are brought for distribution within the trade territory supplied from that point; that oil is transported by the shipload to Wilmington,

admittedly in interstate commerce, but that the movement in intrastate commerce ends there; that, while it is known in advance that a large percentage of the oil brought to Wilmington will be shipped to other points in North Carolina, these shipments are in no sense a part of the original movement, but are independent shipments made in the local distribution of the company's products. As stated, there is little dispute with regard to the facts; the controversy is over the conclusions to be drawn therefrom. The learned District Judge, after a painstaking analysis, held that the shipments in question were not movements in interstate but in intrastate commerce. We think that his holding was correct.

Without reviewing again the facts established by the evidence and found by the District Judge, it is perfectly clear that complainant's tanks and warehouses at Wilmington constituted a storage depot for the distribution of its products. We regard it as relatively unimportant that a part of the oil and gasoline remained in Wilmington; that a large percentage thereof was shipped to substations of complainant instead of direct to purchasers; that the shipments from Wilmington to the substations were directed by the manager of the Charlotte branch who had charge of the Wilmington storage plant; or that the shipments to tank car customers were in some instances made under continuing contracts. The determining factors in the case are that the cargo shipments from without the state ended at Wilmington, that the large quantities of oil and gasoline brought in by the tank steamers, came to rest and lost their identity there in complainant's storage tanks and were mingled with its general stock, and that the shipments from Wilmington were made as a distribution from the general stock and not as a mere means of continuing the transportation begun with the tank steamers. These shipments were, therefore, independent movements. They cannot be distinguished in principle from shipments made by the owner of a chain of stores, who ships a carload of shoes from without the state to a central warehouse, and later ships them out by the box to his various stores as the needs of his trade require. In such case the governing factor is not the fact that the bulk of the car is broken, or that there is a new billing of the goods, or that the merchant may or may not have intended to reship them, but the fact that the shipments out constitute new movements, which are separate and distinct from the movement to the warehouse. To contend, in such case, that the shipments from the warehouse constitute a mere continuation of the interstate movement, would be manifestly absurd; but we think that it would be no more unreasonable than to hold in this case that the tank car shipments from Wilmington are a mere continuation of the interstate transportation by vessel to the storage tanks of complainant.

Our conclusion, we think, is sustained, not only by reason, but also by authority. The rule governing such cases was well stated by the late Judge Woods, speaking for this court in Boyd v. U. S. (C. C. A. 4th) 275 F. 18, as follows:

"When goods moving in interstate commerce reach their ultimate destination, and are reconsigned from that destination on a new contract of shipment to some other point in the same state, the last movement is not interstate [citing cases]."

The case before us, in all of its material aspects, is controlled by the decision of the Supreme Court of the United States in the Davenport Coal Case. Chicago, Milwaukee & St. Paul Ry. Co. v. State of Iowa, 233 U. S. 334, 34 S. Ct. 592, 58 L. Ed. 988. In that case it appeared that a coal company of Davenport, Iowa, had coal shipped to Davenport from points in the state of Illinois. The cars of coal, upon their arrival at Davenport were placed upon an interchange track, and the Chicago, Milwaukee & St. Paul Railway Company was requested to transport them to various points within the state. The railway company refused to accept the coal, loaded as it was in cars belonging to other carriers, and demanded that it be reloaded in its own cars. Upon complaint of the coal company, an order was entered by the Railway Commission of Iowa, directing the railway company to accept the coal for transportation in the cars in which it was loaded, and the state of Iowa applied for a mandatory injunction to enforce this order. The railway company resisted the granting of this injunction, on the ground that the shipments were but continuations of movements in interstate commerce, and that, for this reason, the state Railway Commission was without authority to make the order. The question was thus squarely presented as to whether the shipments from Davenport were to be treated as a continuation of the interstate shipments from the Illinois points, or as independent shipments. The Supreme Court of the United States upheld the order of the state Railway Commission, quoting as the basis of its decision the following finding by the Commission:

"Under the admitted facts, the city of Davenport became a distributing point for coal shipped by the consignor. The certainty in regard to the shipments of coal ended at Davenport. The point where the same was to be shipped beyond Davenport, if at all, was determined after the arrival of the coal at Davenport. The coal was under the control of the consignee, and he could sell it in transit or at Davenport or reconsign it to a point on respondent's railway, or any other railway, at his own discretion."

Mr. Justice Hughes, speaking for the court, said:

"The record discloses no ground for assailing this finding. It is undoubtedly true that the question whether commerce is interstate or intrastate must be determined by the essential character of the commerce and not by mere billing or forms of contract [citing cases]. But the fact that commodities received on interstate shipments are reshipped by the consignees, in the cars in which they are received, to other points of destination, does not necessarily establish a continuity of movement or prevent the reshipment to a point within the same state from having an independent and intrastate character."

In Gulf, Colorado & Santa Fé Ry. Co. v. Texas, 204 U. S. 403, 27 S. Ct. 360, 51 L. Ed. 540, it appeared that a grain dealer of Kansas City, having sold a car of corn for delivery in Goldthwaite, Tex., bought two cars of corn which were shipped from Hudson, S. D., consigned to him at Texarkana, Tex. Upon the arrival of the two cars at Texarkana, the dealer shipped one of them to Goldthwaite in performance of his contract, which had been made before the corn was purchased. Here was an intrastate shipment following an interstate shipment; but the Supreme Court held the intrastate rate applicable on the ground that it was an independent movement and not a continuation of the interstate shipment. As pointed out by Mr. Justice Brandeis (Washington v. Dawson & Co., 264 U. S. at 236, 44 S. Ct. 302, 68 L. Ed. 646), a dictum in the opinion in this case was disapproved in B. & O. S. W. R. R. Co. v. Settle, 260 U. S. 166, 43 S. Ct. 28, 67 L. Ed. 189. The case itself, however, has never been overruled. On the contrary, the Settle Case refers to it as entirely consistent with the later decisions of the court, and it has been cited as controlling authority as late as the 254th U. S. report. Bracht v. San Antonio & Aransas Pass Ry. Co., 254 U. S. 489, 41 S. Ct. 150, 65 L. Ed. 366. In the Settle Case, Mr. Justice Brandeis emphasized as sound law the essential doctrine of the case, and the language used by him supports the decision of the District Court in this case. He said:

"The mere fact that cars received on interstate movement are reshipped by the consignee, after a brief interval, to another point, does not, of course, establish an essential continuity of movement to the latter point. The reshipment, although immediate, may be an independent intrastate movement. The instances are many where a local shipment follows quickly upon an interstate shipment and yet is not to be deemed part of it, even though some further shipment was contemplated when the original movement began. Shipments to and from distributing points often present this situation, if the applicable tariffs do not confer reconsignment or transit privileges. The distinction is clear between cases of that character and the one at bar, where the essential nature of the traffic as a through movement to the point of ultimate destination is shown by the original and persisting intention of the shippers which was carried out." 260 U. S. 173, 174, 43 S. Ct. 28, 31 (67 L. Ed. 189).

The case of General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. Ed. 754, although involving the right of state taxation and not the applicability of intrastate rates, is directly in point, as it decides that the movement in interstate commerce had ended when oil shipped in interstate commerce had been stored in tanks in order that it might be barreled and reshipped, and that, consequently, the oil while in the tanks was subject to state inspection and taxation. In that case the oil was shipped from Pennsylvania to the storage plant of the oil company at Memphis, Tenn. There it was stored in tanks in order that it might be put in barrels for shipment into the states of Arkansas, Louisiana, and Mississippi. The oil in one of the two tanks had already been sold in those states, and that in the other was held for sale there to be shipped out as orders were received. The court held that it was not moving in interstate commerce, and was subject to state taxation. Mr. Justice McKenna, speaking for the court, said:

"Its oil was not in movement through the state. It had reached the destination of its first shipment, and it was held there, not in necessary delay or accommodation to the means of transportation, as in State, etc., v. Engle, supra [34 N. J. Law, 425] but for the business purposes and profit of the company. It was only there for distribution, it is said, to fulfill orders already received. But to do this required that the property be given a lo-

cality in the state beyond a mere halting in its transportation. It required storage there —the maintenance of the means of storage, of putting it in and taking it from storage."

The case of Washington Dehydrated Food Co. v. Great Northern Railway Company, 102 Interst. Com. Com'n R. 363, decided by the Interstate Commerce Commission September 22, 1925, is practically "on all fours" with the case at bar. In that case complainant transported oil in its tank steamers from California ports to its storage tanks at Richmond Beach in the state of Washington. It was there placed in the storage tanks. From these it was loaded into tank cars and shipped to complainant's customers at points in the state of Washington over intrastate routes, "regardless of whether a contract had previously been entered into by a purchaser." The railway company objected to a consideration of the question of the reasonableness of the rates over these routes by the Interstate Commerce Commission, on the ground that the shipments were intrastate, and that no common control, management, or arrangement for a continuous carriage existed between it and complainant. The Commission held that it was without jurisdiction and dismissed the complaint.

The case of Goldsboro, N. C., Chamber of Commerce v. A. C. L. R. R. Co., 91 Interst. Com. Com'n R. 315, involved shipments of fertilizer from Wilmington, N. C., by intrastate routes to other points in North Carolina. The Commission held that it had jurisdiction of shipments made from shipside but not of those made from warehouse. As to these latter, the Commission said:

"While our decision might be different in a case where it appeared that goods intended only for transportation to interior points were stored at the port for the purpose of defeating application of the interstate rates, no question of bad faith in storing the shipments is raised in the instant proceeding; the record indicates that the delivery and storage at Wilmington were bona fide, and solely due to the necessities of the case. Wilmington, as to warehouse shipments, was such a distributing point as is referred to in the last paragraph quoted from the Settle Case. In our opinion the fact is established upon this record that the shipments here considered which were stored at the port fall within the class * * * 'where a local shipment follows quickly upon an interstate shipment and yet is not to be deemed part of it, even though some further shipment was contemplated when the original movement began' [quoting from B. & O. v. Settle]."

The cases relied upon by defendants are not in point, in the view which we take of the facts of this case. The case upon which they chiefly rely (B. & O. S. W. R. Co. v. Settle, 260 U. S. 166, 43 S. Ct. 28, 67 L. Ed. 189), to which reference has already been made, involved the rate applicable on a car of lumber shipped from a point without the state of Ohio to Oakley and thence forwarded to Madisonville, both the latter points being within the state of Ohio and within the switching limits of Cincinnati. The dealers to whom shipment was made had a place of business at Madisonville but none at Oakley. The point of the case is thus stated by the court:

"The movement had been divided by the shippers into two stages—instead of using through billing—because they believed that by so doing they could secure transportation to Madisonville at less than the through interstate rate. Whether under the Act to Regulate Commerce [Comp. St. § 8563 et seq.] lower intermediate rates can be so used in combination, is the precise question for decision."

In stating the law applicable in the solution of this question, the court said:

"The defendant Clephane admitted at the trial that it was intended from the beginning that the cars should go to Madisonville; and this fact was assumed in the instructions complained of. In other words, Madisonville was at all times the destination of the cars; Oakley was to be merely an intermediate stopping place; and the original intention persisted in was carried out. That the interstate journey might end at Oakley was never more than a possibility. Under these circumstances, the intention as it was carried out determined, as matter of law, the essential nature of the movement; and hence that the movement through to Madisonville was an interstate shipment."

And, in pointing out that neither through billing, uninterrupted movement, continuous possession by the carrier, nor unbroken bulk, is an essential of a through interstate shipment, the court added:

"These are common incidents of a through shipment; and, when the intention with which a shipment was made is in issue, the presence, or absence, of one or all of these incidents may be important evidence bearing upon that question."

And in closing the opinion, the court used the language heretofore quoted, to the effect that there are many instances where a local shipment follows quickly upon an interstate shipment and yet is not to be deemed part of

it, *even though some further shipment was contemplated when the original movement began,* and that *shipments to and from distribution points* often present this situation. We think that this language, without further elaboration, distinguishes the case at bar from the Settle Case.

The argument that complainant had in contemplation the shipments to its substations at the time of the transportation to Wilmington, and that therefore the shipments from Wilmington constituted one movement with the interstate shipment to that point, has an element of plausibility, but it is answered by the distinction drawn by Justice Brandeis in the Settle Case, to which we have just adverted. And that intention to make further shipment cannot convert what is essentially an intrastate shipment into interstate commerce has been expressly adjudicated by the Supreme Court in another case. Southern Pacific Co. v. Arizona, 249 U. S. 472, 39 S. Ct. 313, 63 L. Ed. 713.

The cases of Texas & N. O. R. Co. v. Sabine Tram Co., 227 U. S. 112, 33 S. Ct. 229, 57 L. Ed. 442, R. R. Com. of La. v. Texas & Pacific Ry., 229 U. S. 336, 33 S. Ct. 837, 57 L. Ed. 1215, So. Pac. Term Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310, and Chandler v. Pennsylvania R. Co. (C. C. A. 4th), 11 F. (2d) 39, decided January 20, 1926, cited by defendants, deal with shipments made to the seaboard for export, and hold that the shipments are to be treated as shipments in foreign commerce from the time that their movement to their foreign destination commences, and that the character of the shipment is not affected by such incidents of transportation as intrastate billing, reconsignment, reshipment at port, or milling in transit. The same holding was made with respect to interstate commerce in two other cases which defendants press upon us as sustaining their contention. Ohio R. R. Com. v. Worthington, 225 U. S. 101, 32 S. Ct. 653, 56 L. Ed. 1004, and Champlain Realty Co. v. Town of Brattleboro, Vermont, 260 U. S. 366, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195. But none of these cases have any application here, because in all of them the articles of commerce were unquestionably in the course of their journey to the foreign destination, and the question involved in all of them was whether the character of the commerce was changed by certain incidents of the journey. Here the journey of the cargo of oil as a cargo had ended. It had come to rest at a point of distribution, and its identity had been lost; and while, as said in the Settle

Case, further movement of a large part of the oil constituting the cargoes was contemplated; it was contemplated by way of distribution, and not as a continuation of the original movement, as in the cases relied on by defendants.

In Champlain Co. v. Brattleboro, supra, Chief Justice Taft distinguished a temporary interruption of an interstate journey from transportation to a central point preparatory to shipment in interstate commerce such as was dealt with in Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; and, in the course of his opinion, he said:

"If the interruptions are only to promote the safe or convenient transit, then the continuity of the interstate trip is not broken. * * * Interstate continuity of transit is to be determined by a consideration of the various factors of the situation. Chief among these are the intention of the owner, the control he retains to change destination, the agency by which the transit is effected, the actual continuity of the transportation, and the occasion or purpose of the interruption. * * * *"

In so far as this case approves the rule of Coe v. Errol, it is an authority in support of the decision of the District Judge; for manifestly, if intrastate transportation to a central point by way of collecting articles of commerce for interstate shipment is not to be deemed a part of the interstate movement, then, upon the same principle, intrastate transportation by way of distribution following an interstate shipment ought not be deemed a part of the interstate movement. There is no more reason for ascribing an interstate character to distribution after an interstate journey than there is for ascribing it to collection before an interstate journey.

Nor do we think that the cases of Binderup v. Pathé Exchange, 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308, Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229, and Swift & Co. v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518, relied upon by defendants, are in point. These cases arose under the Sherman Act (Comp. St. § 8820 et seq.) and the Packers' and Stockyards Act of 1921 (Comp. St. Ann. Supp. 1923, §§ 8716¼–8716¼z), and have nothing to do with the rates charged by carriers. That there is a difference in the principles applied to the two classes of cases is apparent at a glance. In the one case it is the essential nature of the business which governs; in the other it is the essential nature of the particular transportation involved. If a group of merchants buying and selling

goods in interstate commerce should conspire to raise prices, they would unquestionably be amenable to prosecution under the Sherman Act; but this would not authorize a transportation company to charge interstate rates on a shipment of goods which one of the merchants might make to another within the same state. As said by Judge Sibley in A. C. L. R. R. v. R. R. Commission of Georgia (D. C.) 281 F. 321:

"While in the business of buying and selling goods, interstate commerce may reach all the way from first purchase to final delivery, interstate transportation for the purposes of determining the rate to be charged may have narrower limits." Compare Loewe v. Lawlor, 208 U. S. at page 301, 28 S. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815, with Arkadelphia Milling Co. v. St. Louis S. W. Ry. Co., 249 U. S. at page 151, 39 S. Ct. 237, 63 L. Ed. 517.

The case has been ably presented, and many cases have been cited which it is impossible to review in the limits of this opinion. Sufficient has been said to indicate the principles which we think govern the case and the authorities which we regard as controlling, and to show wherein the cases upon which defendants chiefly rely are, in our opinion, not applicable. After a careful consideration of the evidence and the arguments and briefs of counsel, we concur in the conclusion reached by Judge Meekins in his very able opinion in the case, and the decree entered in the District Court is accordingly affirmed.

Affirmed.