## ATLANTIC COAST LINE R. CO. v. STANDARD OIL CO. OF KENTUCKY.[*]

(Circuit Court of Appeals, Sixth Circuit. December 17, 1926.)

No. 4691.

1. Commerce ⬢34—As respects freight rates, interstate shipment of oil held not to end on delivery to storage tanks awaiting shipment to consumers under annual contracts.

As respects freight rates, interstate movement of fuel oil shipped into state on annual contracts with consumers in state, executed before shipment, *held* not to end on delivery of oil into storage tanks at port of entry, where title passed from producer, to await further shipment to consumers as needed.

*Certiorari granted 47 S. Ct. 475, 71 L. Ed. ——.

**2. Commerce ⊝⟹33—Shipper's intent determines where interstate commerce ends.**

Intent of those engaged in interstate commerce determines whether interstate commerce ends at particular point.

**3. Commerce ⊝⟹34—Interstate movement of gasoline held not to end on delivery to storage tanks at entry port, awaiting further shipment to other points from which distributed to consumers.**

As respects freight rates, interstate movement of gasoline and kerosene *held* not to end when temporarily stored in tanks at port of entry awaiting distribution to shipper's "bulk stations" in interior points, from which distributed to consumers, notwithstanding title did not pass from producer until delivery at entry port.

**4. Commerce ⊝⟹72—State's right to tax is not dependent on rules applicable to federal regulation of transportation rates.**

Right of state to tax articles does not depend on same considerations applicable to federal regulation of transportation rates.

**5. Commerce ⊝⟹34—Interstate movement held to end at port of entry from which oil was distributed to local consumers.**

Interstate movement of lubricating oil, as respects freight rates, *held* to end at port of entry in state from which it was to be distributed to local consumers.

**6. Commerce ⊝⟹34—Interstate movement of gasoline held to end on delivery into storage tanks, from which 13 per cent. was used locally.**

Interstate movement of gasoline and kerosene, as respects freight rates, *held* to end on delivery into storage tanks at port of entry, where 13 per cent. of quantity received into tanks was used locally.

**7. Carriers ⊝⟹202—Shipper held entitled to interest on excess of interstate rates over intrastate rates improperly collected from date of each payment.**

Successful plaintiff in suit to restrain enforcement of interstate rates, and for accounting and refund of excess over intrastate rates improperly collected, *held* entitled to interest on each excess payment from its date.

Appeal from the District Court of the United States for the Western District of Kentucky; Charles I. Dawson, Judge.

Suit by the Standard Oil Company of Kentucky against the Atlantic Coast Line Railroad Company. Decree for plaintiff (13 F.[2d] 633), and defendant appeals. Affirmed in part, and in part modified and remanded.

Helm Bruce, of Louisville, Ky. (Thomas W. Davis, of Wilmington, N. C., and Bruce & Bullitt, of Louisville, Ky., on the brief), for appellant.

Charles G. Middleton, of Louisville, Ky. (Humphrey, Crawford & Middleton, of Louisville, Ky., on the brief), for appellee.

Before DENISON and MOORMAN, Circuit Judges, and HOUGH, District Judge.

DENISON, Circuit Judge. The Standard Oil Company of Kentucky (hereafter called the "company"), sells oil throughout Florida. It is not a producer. It buys its fuel oil from Tampico, Mexico, and its gasoline, kerosene, and lubricating oils from Baten Rouge, La. These oils are shipped from the point of purchase to Florida by boat across or along the Gulf of Mexico. These interstate or foreign shipments enter Florida at two points—Port Tampa, about eight miles from the city of Tampa, and the St. John's river terminal, in the city of Jacksonville. At each of these points the company maintains a group of large tanks, severally used for the different kinds of oil, and into which the oil is pumped from the tank steamers which bring it in. From these tanks the oil is pumped out into the tank cars in which it is shipped to various interior points. Sometimes oil is flowing into and out of the storage tanks—from steamer to car—simultaneously; sometimes some oil is held in the tanks as long as 60 days.

The question in this case is whether this further shipment, from Port Tampa or Jacksonville to the interior points of consumption or of secondary distribution, continues to be that interstate or foreign commerce in the course of which the oil comes in, or is predominantly local commerce, and in its nature intrastate. The question arises in this way. The Florida Railroad Commission has fixed rates for the intrastate shipment of these various oils from Port Tampa and Jacksonville to the interior points. The Atlantic Coast Line Railroad Company (hereafter called the "railway") filed with the Interstate Commerce Commission its proposed rates for these same items of transportation upon the theory that they were interstate or foreign commerce, and, there being no objection, these rates became, in effect, established by the Interstate Commerce Commission, and properly applicable for all items of transportation that were within the jurisdiction of that Commission.

Thereupon the company filed a bill in the court below to enjoin the railway from continuing to collect these interstate rates, to compel an accounting from the railway, and for a refund of such of these rates as had been received in excess of the Florida domestic schedule. The jurisdiction of the court below sufficiently rested upon the diverse citizenship of the parties. A decree was made in favor of the company and the rail-

way appeals. It is not necessary to decide whether the decree was interlocutory or final; either theory sufficiently sustains the appeal. [1] We consider, first, the situation at Port Tampa, and severally with regard to the four kinds of oil, the status of which is not necessarily the same, though all four have two characteristics in common. All enter from outside the state and all are intended for further common carrier shipments—none for use at Port Tampa.

First, of fuel oil. This is substantially all sold by the company to various manufacturers—the ultimate users—upon annual contracts to supply them with stated quantities or with their needs during the period.[1] The incoming stream from Mexico is brought into the tanks rapidly enough to supply the outgoing demand—generally in accordance with the predetermined fixed amounts, but somewhat varied by the developing fluctuations in that demand. In our judgment, this oil travels on a substantially continuous trip from Tampico to the interior points in Florida, and the Port Tampa tanks are a pond or equalizing reservoir, which merely accommodates the supply to the outgo, and which furnishes essentially nothing but storage in transit.

Upon the question whether, for rate control purposes, commerce is interstate or intrastate, the decisions of the Supreme Court furnish no universal rule; each case has been decided on its facts. The Sabine Tram Case (Texas Co. v. Sabine Tram Co., 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442) is an application of the principle which we think now controlling, and an application which is not easy to distinguish from the present case. It declares that domestic gathering together of property for the purpose of foreign shipment and sale must be treated only as an incident of the entire transaction and takes the character of the whole. The flow of commerce in the present case is in the opposite direction, but the principle seems to be wholly analogous. It is suggested that there is distinction in the fact that there the gathering together was only a preparatory incident of the contemplated foreign shipments and sale, while here the contemplated distribution and sale in Florida make up the primary object involved, and the bringing in

from the outside is the preparatory incident; but we can see no sufficient reason for saying that either part of such transaction is primary and the other incidental. As Justice Holmes said in Davis v. Virginia, 236 U. S. 697, 699, 35 S. Ct. 479, 59 L. Ed. 795: "From the point of view of commerce the business was one affair." It is as accurate to say that the local distribution in Florida was merely in aid of the Tampico purchase, and to provide an outlet for the Mexican wells, as to say the converse; probably neither way of putting it is complete.

[2] We cannot say that the mere power of the company to make a diversion at Port Tampa, or to use the oil there or in the immediate vicinity without any substantial further transportation, furnishes any reason for distinguishing from the Sabine Tram Case; for there Powell & Co. had full power and right to send shiploads of the collected lumber up and down the Texas coast, instead of sending it across the ocean. We take the controlling thought of the Sabine Tram Case to be that where there is, both in expectancy and in fact, a clear and established stream of foreign commerce, the intent of the one engaged in that commerce that the items destined therefor are to be considered a part thereof from their origin to their destination is the thing which stamps the whole transaction as foreign commerce; and this reasoning applies as well to the branches of the tree, through which the sap is distributed after passing up the trunk, as to the roots, in which it is made ready for the upward passage.

That this intent to make a continuous interstate shipment is the determinative thing is illustrated by B. & O. Ry. Co. v. Settle, 260 U. S. 166, 43 S. Ct. 28, 67 L. Ed. 189. The initial trip terminated at Oakley. Settle there took possession of the car and had *power* to sell it locally, or to reship it as he pleased; but his *intent* from the beginning had been that the journey should continue to Madisonville, with a temporary stop at Oakley, merely long enough to make arrangements for forwarding. When this constant intent was observed, it was thought that the stop at Oakley, and possession there by Settle, and reshipment from there, did not interrupt the continuity of the journey. The parallel with the present case seems perfect. Settle's motive, to get a lower rate, cannot have been the basis of the decision. This motive was lawful, if the law permitted him to tack these two rates. His intent to make a really through shipment, not his reason for this intent, was the vital thing.

---

[1] Ninety-five per cent. is so sold. That 5 per cent. is sold later may be disregarded, not because 5 per cent. is a negligible fraction (that we do not decide), but because the 5 per cent. was also always destined for further shipment, and the 95 per cent. stamps the whole mass as not intended for miscellaneous public sale, here, there, or anywhere.

Here, the identity of the oil which goes into the tank with that which goes out is not lost. The oil is fungible; each gallon is equal to any other gallon. If 100 barrels were billed from Tampico to the user at an interior point, no one would think that a holding of it on the way in this storage tank for a reasonable time, until the user was ready for it, would affect its character as a through shipment. To this view it does not seem material that the users, instead of one concern, are a known and small group, among whom it is from the beginning intended that the shipment should be distributed.

The Stockyards Case (Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229) is not a rate case, but the sole question was whether the interstate transportation was finished, so as to end the federal power of supervision. It furnishes another application of the same principle—that the intent controls. As to the cattle coming to Chicago from the West, no particular cattle have any particular final destination; it is merely well understood that the mass is to be rearranged, and all the items are to travel on somewhere. The ever-present expectation and intent that the cattle are to continue their journey, and that their delay and rearrangement at the stockyards will only make a temporary stop, maintain the interstate character of the commerce throughout this stoppage. Indeed, there is close analogy in the situations. The stockyards, like the storage tanks, have a limited capacity. They cannot overflow; they must not run dry. The stream runs through them.

Adopting the criterion declared in these three cases, as we understand them, we must conclude that the rates given in the schedule approved by the Interstate Commerce Commission are the rates properly applicable to the shipments of fuel oil from Port Tampa to the interior. In addition to these cases, see Southern Pacific v. I. C. C., 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310; People's Co. v. Public Service Commission, 270 U. S. 550, 46 S. Ct. 371, 70 L. Ed. 726.

[3] With regard to gasoline and kerosene shipments through Port Tampa, we conclude they must be classified with the fuel oil. The situation is the same, with one exception; and this exception, we think, makes the case stronger for the interstate theory. The shipments onward from Port Tampa are all to the so-called bulk stations, which are maintained by the company at different interior points. There is therefore, from the beginning of the shipment at Baton Rouge, the intent and purpose that the gasoline and kerosene shall all be distributed through Port Tampa to these bulk stations. There is not to be, as with the fuel oil, a distribution among a number of users; the shipments all go to the same consignee, according to its needs in different localities; and, since the original purchaser and ultimate consignee are the same person, there is constant community of intent.

It is true that the Port Tampa tanks are filled up when a price advance is anticipated, and are allowed to run low when the market prospect is poor; but doubtless so are the bulk station tanks. It is the latter, not the former, which are the company's points of distribution for public sale. That these intermediate reservoirs adapt themselves to the demand at the end of the contemplated interstate journey has no tendency to show that there are two successive and separate journeys.

[4] We do not intend to say that these oils—fuel, gasoline, and kerosene—may not be subject to state taxation at Port Tampa; that question is not involved. The right of the state to tax is affected by some considerations which are less applicable to rate regulation, and the concurrence in the state of the right to tax and the right to fix transportation rates is not inevitable. Hanley v. Kansas City Co., 187 U. S. 617, 621, 23 S. Ct. 214, 47 L. Ed. 333; Binderup v. Pathe Exchange, 263 U. S. 291, 311, 44 S. Ct. 96, 68 L. Ed. 308.

As to these oils so far considered, the title does not pass from the producer to the company until they are delivered into the company's tanks at the port of entry; but the passage of title was likewise so delayed as to the cattle in the Stockyards Case and as to the gas in the People's Co. Case, supra. Hence we cannot consider this fact as controlling, if important.

[5] The lubricating oils received at Port Tampa are differently treated and present another question. True, they are mostly shipped along from Port Tampa to Tampa; but that haul is very short, and we do not know that any question is made about that rate. At Port Tampa they are pumped directly from the steamers into the tank cars, which go mostly to Tampa. At the Tampa warehouse they are pumped from the tank cars into storage tanks, and then at convenience are put into tank wagons or into barrels, or some other small containers, in which they are partly sold to the general public and partly sent along to the local filling stations maintained by the company. If any goes in bulk from Tampa to the bulk stations, that does not appear, and would not be controlling in

any event. An unstated, but small, fraction goes in the tank cars directly from Port Tampa to the bulk stations, but, for the reasons to be stated with regard to Jacksonville, this fraction cannot be deemed to make a continuous through journey. As to all lubricating oil rehandled at Tampa, we find that by this second halt and handling within the state, by its substantial change of form for future shipment, and by its devotion in its new form, in large part, if not wholly, to general public distribution and sale, it loses its status as material in the course of interstate transportation and takes on a predominantly local character. The authorities relied upon by the company apply to this transaction, and the differences between the handling of the fuel oil and the treatment of the lubricating oil well illustrate the distinction between what continues to be and what ceases to be interstate traffic. Pa. Ry. Co. v. Knight, 192 U. S. 21, 24 S. Ct. 202, 48 L. Ed. 325; Chicago, etc., Co. v. Iowa, 233 U. S. 334, 34 S. Ct. 592, 58 L. Ed. 988; Arkadelphia Co. v. St. Louis, etc., Co., 249 U. S. 134, 39 S. Ct. 237, 63 L. Ed. 517; Southern Pac. v. Arizona, 249 U. S. 472, 39 S. Ct. 313, 63 L. Ed. 713, and Missouri v. Kansas Co., 265 U. S. 298, 44 S. Ct. 544, 68 L. Ed. 1027. The rates established by the Florida commission are the ones properly applicable to lubricating oil shipments from Port Tampa to the interior and from Tampa to points beyond.

At Jacksonville the situation as to lubricating oils is the same as at Port Tampa and Tampa, except that there seems to be no intermediate haul by a common carrier between the river terminal and the city warehouse.

[6] As to gasoline and kerosene, the proof is that 13 per cent. of the amount received into the tanks is used locally at Jacksonville and never gets any further shipment. Thirteen per cent. is a very substantial fraction; it cannot be regarded as negligible. It follows that, as to any particular unit of oil coming into the tanks, it cannot be said that there was always an intent for further transportation and for merely temporary stoppage. The one causing the original shipment knew, and therefore intended, that this particular gallon or barrel, or 100 barrels, might stop at Jacksonville, or might go on. This uncertainty is inconsistent with that clear intent which, and which only, can carry the original character along into the second stage of the interrupted shipment. If, in the Sabine Tram Case, Powell had been, out of his assembled stock, sending substantial shipments to Texas points, or if Settle, in his case, had been supplying a substantial local

demand at Oakley, and sending along to Madisonville what was left, though much the greater fraction, the results in those cases seemingly must have been different. We think that the gasoline and the kerosene, like the lubricating oils, should take the local rates from Jacksonville to other Florida points.

As to the Jacksonville fuel oil, the record is obscure and not sufficient for satisfactory determination. If substantially all of it goes forward to other points, pursuant to an established and known course of business, it is to be treated like the Port Tampa fuel oil; if, according to the established methods and experience, a substantial part of it ends its journey at Jacksonville, it is to be treated like the other oils at Jacksonville. The parties should produce further proofs on this point in the court below. We have no occasion now to deny that the fraction of fuel oil stopping at Jacksonville may be so small that it may be wholly disregarded in determining the through character of this commerce; nor is there necessity for attempting now to decide how small that fraction must be to be so disregarded. If that question arises upon the further proofs, the court below will decide it.

The recent decisions of the Florida Supreme Court (Florida R. R. Commission v. Atlantic Coast Line and Seaboard Air Line [Fla.] 109 So. 656) seem to have been dependent upon a question of pleading; and by the pleadings, as construed, the facts that we have thought controlling as to the Port Tampa fuel oil, gasoline, and kerosene were not presented. In Atlantic Coast Line v. Standard Oil (C. C. A. 4) 12 F.(2d) 541, it did not appear that these same controlling facts existed as to Wilmington. Hence, in so far as we reach a result different from that announced in that case, there is no necessary conflict with that court in our views of the legal principles involved.

[7] The decree below allows interest upon each excess payment from its date. This is in accord with the analogous practice of the Interstate Commerce Commission (in a more doubtful situation) approved by the Supreme Court in Louisville, etc., Co. v. Sloss-Sheffield Co., 269 U. S. 217, 46 S. Ct. 73, 70 L. Ed. 242. The same rule is appropriate to a court recovery.

The decree will be in part affirmed, and in part modified, as indicated in this opinion, and the case is remanded to the court below for the entry of such modified decree and for further proceedings in accordance therewith.

Appellant will recover the costs of this court.