**ALABAMA HIGHWAY EXPRESS, INC.**

v.

**UNITED STATES.**

No. 694–53.

United States Court of Claims.

July 15, 1959.

H. Cecil Kilpatrick, Washington, D. C., E. David Haigler, Birmingham, Ala., Francis H. Hare, Birmingham, Ala., and M. Kilpatrick, Ballard & Beasley, Washington, D. C., on the briefs, for plaintiff.

Kathryn H. Baldwin, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., for defendant.

MADDEN, Judge.

The plaintiff sues to recover money withheld by, or refunded to, the Government because, the Government insisted, it had overpaid the plaintiff for hauling aviation gasoline in tank trucks from Mobile and Port Birmingham, Alabama to Army airfields in that state during the years 1943 and 1944.

Under date of May 14, as supplemented on June 14, 1943, the plaintiff entered into a written contract with the Government for the transportation of an amount of aviation fuel not to exceed a specified number of gallons from tanks at the port of Mobile to Gunter Field at Montgomery, and to Courtland, both in Alabama. The tanks at Mobile belonged to the Standard Oil Company of Kentucky. The rates prescribed in the contract were the equivalent of the published interstate commerce common carrier

rates for such transportation. They were higher than the Alabama intrastate published rates.

As the proposed contract was originally drafted by the Government it contained the following provision:

"* * * and provided further, that, in the event that any published rates at the date of this contract for comparable services are lower than the prices named herein, the Contractor agrees to reduce said prices to the level of any such lower published rates."

The plaintiff refused to execute the proposed contract until this provision was deleted. In negotiating for an extension of the contract, the Government's representatives requested a reduction of the rates, pointing out that the contract rates were higher than tank car railroad rates, and higher than intrastate truck tank rates. The plaintiff refused to agree to reduce its rates.

The written contract expired on September 30, 1943. Thereafter the Government's representatives continued to direct the plaintiff to haul gasoline from the terminal at Mobile to Gunter Field and to Courtland, and also to Maxwell Field, Tuskegee, Napier Field and Birmingham, all within the State of Alabama. On all this haulage the plaintiff billed the Government at the contract rates, and the bills were paid.

The gasoline in question was bought by the Government from refineries in Louisiana and Texas. It was brought to Mobile in tankers and barges, and pumped into the tanks of the Standard Oil Company at Mobile. The Government had contracted with Standard Oil, for a fixed rate per gallon, to receive the gasoline into its tanks, store it, and deliver it, on the Government's orders, into tank cars, tank trucks or barges for further transportation. Standard Oil was privileged to commingle the Government's gasoline with other gasoline of the same quality. The ocean tankers held from 60,000 to 75,000 barrels, and came to the Standard Oil terminal two or three times a month. The capacity of

the terminal was in excess of 100,000 barrels. No shipment moved through the terminal on a through bill of lading from its origin in Louisiana or Texas to any point beyond Mobile. The gasoline moved out of the terminal at Mobile on separate requests for the filling of tank trucks or railroad tank cars, and each such movement was on a new and separate bill of lading. When the gasoline was shipped from the refineries in Louisiana and Texas, all that was known of its future course was that it would be unloaded at the Standard Oil terminal in Mobile, and that most of it would be later transported to one or another of several destinations in Alabama.

The gasoline hauled by the plaintiff from Port Birmingham, Alabama, was received by the plaintiff from the terminal of Southport Petroleum Company. Southport had a contract with the Government under which Southport agreed to transport by barge Government-owned gasoline from the Texas City, Texas, area to Southport's terminal at Port Birmingham, receive it there, and later deliver it into transportation equipment as the Government might direct. Beginning about September 6, 1943, the Government caused Southport to deliver gasoline to the plaintiff's tank trucks, which delivered the gasoline to Gunter Field, Maxwell Field, Tuskegee, Courtland, Napier Field and Birmingham, all within the State of Alabama.

For the transportation from Port Birmingham, the parties never made a written contract. Representatives of the parties met with the District Supervisor of the Interstate Commerce Commission at Birmingham to obtain an opinion as to whether the plaintiff's transportation was interstate commerce or intrastate commerce. Upon the basis of the information given the Supervisor, the information perhaps not being entirely correct, he gave his opinion that the plaintiff's hauling was in interstate commerce. The purpose of this consultation was to determine what rates should be applicable. The plaintiff billed the Government at interstate rates for the transportation

from Port Birmingham and the bills were paid.

The plaintiff had no permanent license to be a common carrier in interstate commerce of petroleum products in tank trucks during the period in question. It had a temporary license for such hauling for one month from Port Birmingham and for four months from Mobile. It had no license at all as a contract carrier in interstate commerce from the two ports. It had a license for such transportation as a common carrier in intrastate commerce.

In the plaintiff's 1943 written contract some 10 specific obligations were imposed upon it which are not normal obligations of a common carrier. They are recited in finding 33.

If there had been no contract involved in the instant case, the properly applicable rates would have been the published Alabama intrastate rates. The gasoline in question had been shipped from Louisiana or Texas refineries, by tankers or barges, on bills of lading showing its destination to be the Standard Oil terminal at Mobile or the Southport Company's terminal at Port Birmingham. It was intended to remain at the terminal until the Government's agents should, from time to time, direct the terminal to deliver various quantities of it into tank trucks or tank railroad cars to be carried to such of several possible destinations as the Government agent should direct. The length of time it remained at the terminal depended upon the needs of the Government from time to time, at the airfields where the gasoline was to be consumed.

The situation was, in all essential respects, like that presented to the Supreme Court of the United States in Atlantic Coast Line Railroad Co. v. Standard Oil Co. of Kentucky, 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270. In that case Standard Oil caused petroleum products to be brought by water transportation from Louisiana and Mexico to Standard's terminals on the coast of Florida. From the terminals it was pumped into railroad tank cars, and carried by the railroad to Standard's bulk stations and service stations in Florida. The railroad sought to collect interstate rates for this transportation. The Court held that the intrastate rates were applicable. It said at page 271 of 275 U.S., at page 111 of 48 S.Ct. that the delivery of the oil from the ocean tanker to Standard's terminals was a "closing of an interstate or foreign transportation and a beginning of intrastate distribution for the purposes and business of" Standard. Atlantic Coast Line Railroad Co. v. Standard Oil Company of New Jersey, 4 Cir., 12 F.2d 541, 60 A.L.R. 1456, is to the same effect. The Interstate Commerce Commission has, of course, followed the Supreme Court ruling. Ex parte No. MC–48, 71 M.C.C. 17, issued March 7, 1957. The Commission, in its decision, properly distinguished such cases as Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735 and Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 71 S. Ct. 240, 95 L.Ed. 239, on the ground that those cases involved "criteria employed by the courts in a consideration of the constitutionality or remedial purposes of other statutes" not involved in the cases before the Commission. These rate cases do not, like many cases relating to the commerce power, of which Stafford v. Wallace, supra, and National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L. Ed. 893, are examples, involve an attempt by Congress to exercise that power to its ultimate Constitutional limits. They are concerned only with such reach of the power as Congress has actually exercised or has given the Commission the power to exercise, in the statutes governing transportation.

Having concluded that the legally applicable rates, in the absence of special circumstances, would have been Alabama's intrastate rates, we must determine whether the written contract, and the course of dealing of the parties, removed their obligations from that normal legal situation.

As to the transportation from Mobile during the term of the written

contract, that is, down to September 30, 1943, we think the plaintiff was entitled to the contract rates. The United States is free to contract for rates for intrastate transportation other than those set by State regulatory bodies. Public Utilities Commission of State of California v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470; Union Transfer Company v. United States, Ct.Cl., 168 F. Supp. 217; Hughes Transportation, Inc. v. United States, Ct.Cl., 168 F.Supp. 219. The litigated cases on this question have been cases in which the United States has contracted for rates less than the State scheduled rates. But we see no reason why, if the Government desires services or privileges in addition to those which a common carrier is obliged to render or accord to a shipper, it may not, under those decisions, validly contract to pay a higher rate than the common carrier rate.

At the time the Mobile contract expired on September 30, 1943, the situation was that the Government had requested a reduction of rates and the plaintiff had refused the reduction. After September 30, the Government continued to give the plaintiff gasoline to haul, the plaintiff hauled it, billed the Government for the contract rates, and the bills were paid. This course of conduct would, in ordinary circumstances, give rise to a contract, evidenced by acts rather than by written or spoken words, to continue to pay the rates of the former contract. Since, as we have seen, the Government had the power to contract for rates different from the scheduled rates, we conclude that the carriage from Mobile, after September 30, 1943, continued to be at the contract rates.

As to the plaintiff's carriage of gasoline from Port Birmingham, there was, as we have seen, no express contract at any time. The consultation of the parties with the agent of the Interstate Commerce Commission shows that they wanted to know what was the legally applicable rate. That agent told them, erroneously, that the interstate rate was applicable. If he had advised them to the contrary, it may well be that the plaintiff would have refused to haul the gasoline, or to accord the Government any special privileges, unless a higher rate was contracted for. As it was, however, we think that if their conduct indicated any agreement at all, it was that the law, as to which they were mistaken, should take its course.

The plaintiff argues that, because of the advice received from the agent of the Interstate Commerce Commission, the parties thought that the interstate rates were applicable and should be held to have agreed that they should be applicable. But contracting out of a legally fixed rate, which cannot be done at all by a private shipper, is not to be lightly assumed, even when the Government's conduct is involved. We recognize that this means that the plaintiff does not get paid for the special services and privileges recited in the Mobile contract, which, presumably, were rendered and accorded in the performance of the carriage from Port Birmingham. We suppose that a common carrier may not perform special services for a private shipper, unless the rate schedules provide for payment for them. If it performs them, and there is no schedule of payment for them, it cannot charge the shipper for their value. The plaintiff should, then, have refused to accord special privileges to the Government without a contract to pay for them.

The plaintiff is entitled to recover the difference between the amount paid it for transportation from Mobile, and the amount which the Government, in its recoupment action, allowed it for that transportation. Judgment will be entered for the plaintiff. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and LARAMORE and WHITAKER, Judges, concur.