**SEABOARD AIR LINE RY. CO. et al. v. LEE et al.**

(District Court, E. D. North Carolina. August 28, 1926.)

No. 511.

Commerce ⊜⟩34—Reshipments of fertilizer from port of receipt by importer to points in same state held intrastate, and subject to local rates.

An importer of nitrate of soda, bought in Chile and brought from there in chartered ships, received delivery at Wilmington, N. C., which was his place of business. On arrival the nitrate was stored or delivered from the dock to purchasers to whom quantities had been resold; all contracts of resale providing for delivery at Wilmington. Purchasers, either from store or dock, reshipped by rail on new billing to various manufacturers of fertilizer or dealers to points both within and without the state. *Held,* that such reshipments were not in continuance of the foreign shipment, not being within the intention of the importer, whose purpose was fully subserved on delivery to him at Wilmington, but were new and independent movements, with which the importer had no concern, and that where such a reshipment was to a' point within the state it was an intrastate shipment, and subject to established local rates.

In Equity. Suit by the Seaboard Air Line Railway Company and the Atlantic Coast Line Railroad Company against William T. Lee and others, as members of the Corporation Commission of the state of North Carolina, and others. On motion for preliminary injunction. Motion denied.

This is a suit in equity, brought by the complainants to enjoin the enforcement of an order of the North Carolina Corporation Commission, the material portion of which is as follows:

"Ordered, that the Atlantic Coast Line Railroad Company, and the Seaboard Air Line Railway Company, issue within ten days from this date instructions to their agents at Wilmington to apply the intrastate rates on shipments from Wilmington to destinations in this state upon all shipments having origin as rail shipments at Wilmington and in good faith, by or upon order of, or to order notify of, parties other than the original consignees of such traffic at Wilmington, that contrary instructions now in effect be canceled within ten days, and that copy of such instructions be filed with the Corporation Commission within ten days."

This order was entered by the commission on April 22, 1924, after a hearing held on February 26th of same year, pursuant to notice to the complainants, relating solely to the rates applied to movements of fertilizer materials from the port of Wilmington, N. C., to interior points in the state. At the hearing, however, the scope thereof was broadened, by mutual consent, so as to include an investigation of the rates upon like movements of all commodities imported into Wilmington—the testimony agreeing that the manner of dealing in all such commodities was, in all respects, the same. This common manner of dealing may be illustrated, therefore, by describing the method employed by Grace & Co., with reference to nitrate of soda, one of the most important substances involved.

Nitrate of soda is imported from Chile in large quantities annually. The shipping season begins in December and ends in May or June. The nitrate is purchased in Chile, and transported in vessels chartered for this purpose to various ports of entry in the United States, notably New York, Baltimore, Newport News, Wilmington, Charleston, and New Orleans. When a vessel leaves Chile, it is not known at which of these ports it will discharge its cargo. This is not determined until the vessel reaches the Panama Canal, where definite directions as to the port of entry are given, and is dependent upon demands of the trade and the importer's supply of stock at the various ports.

The importer sells to the manufacturer and the retailer, and the practice in making sales varies. In some instances the purchase is made direct from the importer, while in others it is made through a sales agent of the importer, or through a broker. The contracts of sale call uniformly for delivery at Wilmington, usually ex vessel or ex store, though in some instances f. o. b. the dock, and invariably provide, "No arrival, no sale." Some of these contracts are made in advance of the shipping season, some while the nitrate is in transit, and some after its arrival at Wilmington, where the importer, under a standing arrangement with the Wilmington Compress Company to use its warehouse for this purpose, maintains constantly during the shipping season a supply stock.

Nitrate is shipped in bags or in bulk, and in some instances partly in both. When the vessel arrives at Wilmington, the cargo is discharged by a stevedore, at the expense of the vessel, upon the docks of the Wilmington Compress Company, with whom the importer has also a continuing agreement to use its docks for this purpose. Where the charter party so requires, the cargo is also weighed at the vessel's expense. After its discharge from the vessel, it is delivered to the importer upon the dock, who, through his agents, Heide & Co., proceeds to brand and tag the nitrate, in accordance with the inspection laws of the state, and, in those instances

where it is necessary or desired, to bag it. At this time, too, the importer segregates and weighs those quantities of the nitrate for which he has contracts permitting immediate delivery, and delivers same to the various purchasers, for whom Heide & Co. also act as agents; the remainder of the cargo being stored.

From this point on, the movement of the nitrate, other than that stored by the importer, is directed and controlled by the purchaser, acting through Heide & Co. After delivery to him, as aforesaid, the purchaser pays all charges in connection with the nitrate, including the wharfage and handling charges, which are the same, whether the nitrate be stored, reshipped from the dock, or transported for local use in Wilmington by truck. About 80 per cent. of the nitrate imported is reshipped by the purchasers direct from shipside, though a considerable portion of this percentage is merely switched to local points in Wilmington. The remainder is stored in the warehouse of the Wilmington Compress Company. Whether it is stored, or reshipped immediately to one or various destinations, depends, of course, upon the demands of the purchaser's trade; and it appears that, in some instances, the ownership of the nitrate changes as many as half a dozen times before removal from the dock.

The bills of lading issued by complainants on movements of nitrate from Wilmington to interior points of North Carolina vary in form and character. In all cases the purchaser, or the party to whom he has resold at Wilmington, appears as consignor. At times the same party appears as consignee, while at others the party to whom the purchaser has resold, at an interior point, is so designated. In those instances where it is desired that the importer retain a lien for the purchase price, the nitrate is shipped by the purchaser to himself or another, "order notify the importer." In no other instance is the importer referred to in these bills of lading. And in all instances the freight from Wilmington to the interior point is paid by the purchaser, or the party to whom he has resold.

Murray Allen, of Raleigh, N. C., C. P. Reynolds, of Norfolk, Va., F. W. Gwathmey, of Washington, D. C., T. W. Davis, of Wilmington, N. C., and J. F. Wright, of Norfolk, Va., for complainants.

P. W. McMullan, of Elizabeth City, N. C., and F. P. Hobgood, Jr., and S. S. Alderman, both of Greensboro, N. C., for defendants.

Before PARKER, Circuit Judge, and WEBB and MEEKINS, District Judges.

MEEKINS, District Judge (after stating the facts as above). Considering this cause upon the evidence set out in the record, the question presented to us is whether a foreign or an intrastate character attaches to the rail movements of the commodities imported into Wilmington, and there reshipped, in the manner above described, to interior points in the state of North Carolina; that is to say: What is the essential character of the commerce? The correct answer to that question is the law of this case.

Using for illustration nitrate of soda, the movement of which is concededly typical, complainants contend that the reshipment from Wilmington is a continuation of the original movement from Chile; that, at the time of the original shipment, such reshipment in the manner described, was contemplated; and that, this being true, the movement from Wilmington to the interior of North Carolina is not divested of its foreign character, notwithstanding the issuance of new bills of lading at the port, and other admitted incidents of the commerce.

The defendants contend that, when the cargo is discharged at Wilmington, it has reached the end of its journey as foreign commerce; that any further movement from that point proceeds, not only upon new billing, but after a definite break in the transportation, restoration of possession to the importer, separation of the bulk, and its distribution in part, amongst various purchasers at the port; and that, this being true, such further movement necessarily takes on a new and independent character, and becomes intrastate or interstate commerce, according as such reshipment is to a point within, or a point without, the state.

In support of their contentions, complainants cite us to a number of authorities, many of which deal with the specific question presented in the instant case. Of these, the most important, perhaps, are Texas & N. O. Railroad Co. v. Sabine Tram Co., 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442, Railroad Commission v. Worthington, 225 U. S. 101, 32 S. Ct. 653, 56 L. Ed. 1004, and Baltimore & O. Railroad Co. v. Settle, 260 U. S. 166, 43 S. Ct. 28, 67 L. Ed. 189.

Railroad Company v. Sabine Tram Company, supra, involved consideration of the character of a shipment of lumber from Ruliff, Tex. This shipment was made upon the order of Powell Company, recognized exporters of lumber, to fill contracts theretofore made for delivery in Europe. By reason of the fact that there were no established through rates from Ruliff to foreign ports,

the lumber was billed to Sabine Pass, a port in the state of Texas. The billing further showed that the lumber was "for export." Upon its arrival at Sabine Pass, the lumber, at the direction of Powell Company, was carried one-quarter of a mile beyond the station, and unloaded in the waters of the slip, in reach of ship's tackle, where it remained until the arrival of the vessel previously chartered to carry it to Europe. At Sabine Pass, Powell Company further demanded and received terminal facilities, additional free time, and other privileges accorded only to shippers of export freight, as well as immunity from storage and demurrage charges to which all local shipments were subject. And, in addition to these consideration, which clearly demonstrate the foreign character of the shipment, it further appears that the case was tried upon agreed facts, the last finding whereof is that "the shipments in controversy, together with other shipments of lumber to Sabine and Sabine Pass, constitute a large and constantly recurring course of foreign commerce" through Sabine and Sabine Pass. The facts in Railroad Commission v. Worthington were very similar.

In Baltimore & O. Railroad Co. v. Settle, it appeared that Settle & Co., lumber dealers at Madisonville, Ohio, had lumber shipped from Southern points to Oakley, Ohio, paid the freight to that point, whence the lumber, in the same cars, was immediately reshipped to Madisonville upon local bills of lading and at local rates. The decision of the court is based upon the admitted intention of Settle & Co., original and persisting, to ship the lumber to Madisonville, the original billing to Oakley having been fraudulently designed to defeat the application of the interstate rate, and to secure the lower local rate from that point. Upon this admission the court held that the carriers were entitled to recover the difference between the local and interstate rates. The court further held, in effect, however, that, but for Settle & Co.'s admission as to their intent, the jury could well have found that the movement from Oakley to Madisonville was a new, independent, and intrastate movement, and the court practically said that, had the shipment been originally consigned to Oakley for a bona fide purpose of the shipper, for instance, for the purpose of making a sale at that point, the shipment would have been intrastate as a matter of law. In conclusion, the court said:

"The mere fact that cars received on intrastate movement are reshipped by the consignee, after a brief interval, to another point, does not, of course, establish an essential continuity of movement to the latter point. The reshipment, although immediate, may be an independent and intrastate movement. The instances are many where a local shipment follows quickly upon an interstate shipment, and yet is not to be deemed a part of it, even though some further shipment was contemplated when the original movement began. Shipments to and from distributing points often present this situation, if the applicable tariffs do not confer reconsignment or transit privileges. The distinction is clear between cases of that character and the one at bar, where the essential nature of the traffic as a through movement to the point of ultimate destination is shown by the original and persisting intention of the shippers which was carried out."

The reasons are obvious why the principles enunciated in the quoted decisions, and in similar cases, cannot be deemed controlling of the instant case. The instant record, rather, in our view, discloses a state of facts which call for the application of other principles, enunciated in Gulf, Colorado & Santa Fé Railway v. Texas, 204 U. S. 403, 27 S. Ct. 360, 51 L. Ed. 540, Chicago, Milwaukee & St. Paul Railway Co. v. Iowa, 233 U. S. 334, 34 S. Ct. 592, 58 L. Ed. 988, and Pennsylvania Railroad v. Mitchell Coal Co., 238 U. S. 252, 35 S. Ct. 787, 59 L. Ed. 1293.

Indeed, the facts of this case are strikingly similar to those in Railway v. Texas, supra, which involved consideration of the rate to be applied upon a shipment of corn from Texarkana, Tex., to Goldthwaite, in the same state. In that case it appeared that the Harroun Commission Company, of Kansas City, having purchased two cars of corn at Hudson, S. D., for delivery to its order at Texarkana, Tex., sold the corn during transit to the Hardin Grain Company, which had previously sold two cars of corn for future delivery to Saylor & Burnett, of Goldthwaite, Tex., and who purchased the corn in transit, with the present intention of immediately reshipping same, upon its arrival at Texarkana, to Saylor & Burnett, at Goldthwaite. It was held that the shipment from Texarkana to Goldthwaite was intrastate in character, notwithstanding it closely followed the original shipment from Hudson, S. D., and was made in the same cars.

The authority of this case has never been doubted, though some of its reasoning has been disapproved, and the correctness of its conclusion has been repeatedly reaffirmed. It is difficult to escape the conclusion that it is controlling of the instant case. The sole actual difference is that, while the cited case in-

volved a single shipment, the instant involves a number of shipments, constantly recurring. This difference, however, is not important. The essential character of the commerce is not to be determined by its volume, but by the original and persisting intention of the shipper, using that term in the sense of him for whose benefit the shipment is made, or, as it is sometimes expressed, by the intention of the shipper, which is carried out.

It is entirely clear that, at the time a cargo of nitrate starts on its journey from Chile, the importer has no intention that its ultimate destination shall be an interior point in the state. Indeed, it is unknown at such time to which port of entry the vessel will proceed. The importer knows, of course, that nitrate of soda is a fertilizer, or a fertilizer ingredient, and that, therefore, a cargo, or a large part thereof, consigned to Wilmington, will ultimately find its way, in segregated lots, to the manufacturers and the agriculturists located in the trade territory of that port. He knows, further, of course, that interior movements of the products must proceed by rail from Wilmington. But this is very different from saying that he intends, at the time of consigning a cargo to Wilmington, to reship it from that point in mere continuation of the original movement from Chile.

On the other hand, the record conclusively shows that his intention is fully carried out, and his purposes fully subserved, when the cargo is delivered to him at Wilmington. At this point he has an established place of business. At this point his contracts of sale call uniformly for delivery. Not only is it physically impossible, by reason of a lack of through facilities, to ship this commodity, in small quantities, from Chile to interior points in the state, but it is further obvious that, even were such facilities existent, the adoption of this mode of shipment could subserve no useful purpose of the importer. As aforesaid, his contracts call uniformly for delivery at Wilmington. Why, then, should he make shipment to an interior point in the state? Manifestly the sole result of so doing would be to require a reshipment to the port before delivery could be enforced.

It is insisted, however, that the importer could as readily make contracts calling for delivery at interior points. This may, or may not, be true. In any event, there is no legal requirement that he do so. The record carries no suggestion that the method of shipment and dealing described is fraudulently resorted to or otherwise adopted in order to defeat the application of the interstate rate. On the other hand, it conclusively appears that this method has been continuously followed since the beginning of these importations, and was in effect prior to the time when the controversy as to rates arose. Nor is there any suggestion that the selection of Wilmington as a place of sale and delivery is merely feigned. And, even if so, it would be unimportant, since it is a prerequisite to the operation of the order complained of that there be a bona fide change of title at the port.

Wilmington, on the facts of this record, is the importer's distributing point, at which the cargo is restored to his possession, having come definitely to rest, in accordance with his original and continuing intention. The facts of this case, indeed, strongly resemble those in Standard Oil Co. v. Atlantic Coast Line Railroad Co. (D. C.) 6 F.(2d) 911. It is true that, in the cited case, the traffic was transported in the ships of the owners, while, in this case, vessels are chartered; that, in the cited case, the owner has storage tanks at Wilmington, while, in this case, the importer uses for storage purposes the warehouse of the Wilmington Compress Company, under a continuing agreement; and that movements from shipside, in the cited case, pass to cars through such storage tanks, while, in the instant case, they merely pass over the docks of said compress company in trucks. But these differences are immaterial.

To create a distributing point, the one essential fact is distribution. Whether it be made from premises owned, leased, or merely used for this purpose, under a continuing agreement, is unimportant. In the instant case, as in the cited one, the important considerations are that, at Wilmington, there is an interruption of the movement, new billing, a breakage of the bulk, and a resumption of possession by the owner, not for some purpose purely incidental to the transportation covered by transit or consignment privileges in the contract of transportation, but for the real bona fide purpose of the importer, in order to enable him to break the bulk and sell the commodity, or to deliver it pursuant to contracts heretofore made, thus consummating his original persisting intention with regard to the commodities imported from Chile to Wilmington, N. C.

We are not unmindful that the Supreme Court of the United States has said that "neither through billing, uninterrupted movement, continuous possession by the carrier, nor unbroken bulk, is an essential of a through interstate shipment." It is to be remembered, however, that this language was used by the court in a case, Baltimore & O. R. Co. v. Settle, 260 U. S. 166, 43 S. Ct. 28,

67 L. Ed. 189, in which the intention to make a through interstate shipment was admitted. And it should be noted, also, that in the same case the court further said:

"These are common incidents of a through shipment; and when the intention with which a shipment was made is in issue, the presence, or absence, of one or all of these incidents may be important evidence bearing upon that question."

In our view, little, if any, importance attaches to the fact that, in a majority of instances, contracts of sale are made in advance of the shipment, or during transit, or to the further fact that reshipment by the purchaser is made from shipside and follows closely the arrival of the vessel at the port. These are but common and characteristic incidents of the business of every jobber. In Baltimore & O. R. Co. v. Settle, supra, it is clearly pointed out that the independent character of a reshipment is not affected by the fact that it follows immediately a shipment in interstate commerce, and in Chicago, Milwaukee & St. Paul R. Co. v. Iowa, 233 U. S. 334, 34 S. Ct. 592, 58 L. Ed. 988, it appeared that the reshipments were in fact made immediately upon the arrival of the coal at Davenport, and in the same cars; while, speaking to the first of these questions, that is, the time of execution of the contracts of sale, the Supreme Court of the United States, in General Oil Company v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. Ed. 754, uses this expressive language:

"The company was doing business in the state, and its property was receiving the protection of the state. Its oil was not in movement through the state. It had reached the destination of its first shipment, and it was held there, not in necessary delay or accommodation to the means of transportation as in State, etc., v. Engle, 34 N. J. Law, 425, but for the business purposes and profit of the company. It was only there for distribution, it is said, to fulfill orders already received. But to do this required that the property be given a locality in the state beyond a mere halting in its transportation."

Let us assume, for purposes of illustration, that these importations into Wilming- ton had been in interstate instead of foreign commerce. Could it, in such case, be reasonably contended that the initial carrier was responsible for loss or damage occurring during a reshipment by a purchaser at that point? The conclusive answer to the question is that, under the terms of the original contract of shipment, made in good faith and fairly expressed, every obligation of the initial carrier ceased at Wilmington. It has been so decided. Bracht v. San Antonio & A. & P. Ry., 254 U. S. 489, 41 S. Ct. 150, 65 L. Ed. 366.

The mere fact that rail shipment begins at Wilmington, or that there is a change of title at Wilmington, or that there is a rebilling at Wilmington to parties other than the original consignees, does not determine the essential character of the commerce, but, as stated, these are mere incidents of the commerce. Moreover, an order of the state Corporation Commission would not be valid which held that the presence of any one or all of these incidents of commerce of themselves constitutes intrastate commerce. The order of the state Corporation Commission under consideration must be interpreted in the light of the answer of the commission, and in the light of the evidence set out in the record. It is clear that the application of the order is solely with regard to what we hold to be intrastate commerce. If there were evidence of any purpose or attempt to apply the order to interstate or foreign commerce, or to make such incidents of commerce as the beginning of rail transportation, or change of title, or rebilling, determinative factors of what is interstate commerce, an altogether different question would be presented.

Taking the facts before us as presented by the evidence, and upon application of well-considered and controlling cases of the United States Supreme Court, we are of the opinion that the out-bound movements from Wilmington to the interior of North Carolina, involved in this inquiry, are intrastate in character, and that therefore the order of the commission complained of is without prejudice to complainants.

The injunction prayed for must be, and is, hereby denied.