**DALLUM et al. v. FARMERS CO-OPERA-TIVE TRUCKING ASS'N.**

No. 136.

District Court, D. Minnesota,
Sixth Division.

Oct. 2, 1942.

Charles W. Kennedy, of Wadena, Minn., for plaintiffs.

R. E. Barron (of Barron & Bradford), of Wadena, Minn., for defendant.

SULLIVAN, District Judge.

This is an action brought under the Fair Labor Standards Act of 1938, 29 U.S. C.A., § 201 et seq., by the plaintiffs against their former employer, to recover overtime compensation and liquidated damages.

The plaintiffs, at the times set out in the complaint herein, were employed by the defendant as truck driver and helper. The defendant is a co-operative trucking association, organized under the laws of the State of Minnesota, with its principal place of business at Wadena, Minnesota, and a membership of creameries and produce companies located in that vicinity.

During the period with which we are concerned, butter, eggs and farm products were picked up and gathered by the defendant's trucks at the different member creameries, and these commodities were then transported to Wadena, Minnesota, where the loads were reassembled and moved on to St. Paul, Minneapolis or Duluth, at which destinations the shipments were unloaded at either railroad or steamship company docks, or at the dock of another motor carrier. No provision in the contracts of carriage for member creameries to St. Paul, Minneapolis and Duluth was made for a continuation of the haul across state lines. It was known to the plaintiffs and all interested in the movement of said commodities that the same were to go forward in interstate commerce. The contract issued by the defendant covered the local haul only, and carriage charges were made by it for that part of the haul. When the defendant made delivery of the commodities to railroad, steamship company or forwarder, a bill of lading was issued by such carrier to the interstate destination.

The parties have designated the hauls involved in this proceeding as (1) Sebeka Butter Haul, (2) Northwest Dairy Forwarding Haul, (3) Terminal Hauls, either to St. Paul or Minneapolis through a terminal, or to Glendenning Transfer, (4)

National Butter Haul, and (5) Movements Across State Lines.

It is the contention of the plaintiffs that they are engaged in commerce, as the same is defined in the Fair Labor Standards Act, 29 U.S.C.A. § 203, and that they are entitled to the benefits of said Act. On the other hand, the defendant contends that it is exempt from the operation of the Fair Labor Standards Act, relating to maximum hours, 29 U.S.C.A. § 207, because of Section 13(b) (1) of the Act, 29 U.S.C.A. § 213(b) (1), which provides that

"(b) The provisions of section 207 [of this title] shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49."

Section 304, 49 U.S.C.A., provides, inter alia, that "it shall be the duty of the Commission [Interstate Commerce Commission]—(1) To regulate common carriers by motor vehicle, * * * and to that end the Commission may establish reasonable requirements with respect to * * * qualifications and maximum hours of service of employees, and safety of operation and equipment. * * * (3) To establish for private carriers * * * if need therefor is found, reasonable requirements to promote safety of operation.

The defendant was authorized by the Railroad and Warehouse Commission of Minnesota to operate as an intrastate carrier. It had no authority, either from the State or from the Interstate Commerce Commission, to operate as an interstate carrier. The defendant argues that its hauls to St. Paul, Minneapolis and Duluth were movements in interstate commerce and that, being a co-operative trucking association, it is excepted from the requirements of the Motor Carrier Act of 1935, as amended, by reason of Section 203(b) (5) of that Act, 49 U.S.C.A. § 303 (b) (5), save and except such provisions of the Act as relate to safety of operation.

■ Situations may arise where an employee is engaged in interstate commerce, as defined in the Fair Labor Standards Act, and yet not be entitled to the benefits of that Act. Such an occurrence may come about in the employment of truck drivers. If an employee be engaged in the operation of a truck used in the transportation of property in interstate commerce, he is exempt from the provisions of the Fair Labor Standards Act by virtue of Section 13(b) (1) thereof.

■ Irrespective of whether the defendant is a co-operative trucking association and, as such, exempt from qualification under the Motor Carrier Act, the plaintiffs' employment was of a nature which involved safety of operation. United States et al. v. American Trucking Associations, Inc. et al., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; Neuwirth v. Kafer, 176 Misc. 864, 29 N.Y.S.2d 178.

The provisions of the Motor Carrier Act, 49 U.S.C.A. § 302, "apply to the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce * * *."

The Fair Labor Standards Act of 1938, 29 U.S.C.A. § 206 provides that: "Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages [at the rates specified in the Act]."

"Commerce" is defined in the Act as "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof".

"Produced" is stated to mean "produced, manufactured, mined, handled, or in any other manner worked on in any State * * *". 29 U.S.C.A. §§ 203(b) and (j).

■ The question presented is, were the plaintiffs engaged in the operation of a motor truck used in the transportation of goods in interstate commerce. If they were so engaged, then the Fair Labor Standards Act would have no application to the maximum hours of service. On the other hand, if the goods which the trucks hauled were not shipments in interstate commerce, the Fair Labor Standards Act would, in all respects, govern the employment of the plaintiffs.

To determine the classification of commerce, the decided cases point to certain generally applied tests. We might say one of the controlling tests of whether a shipment is interstate or intrastate is the intention of the parties in respect thereto, and the manner and way of carrying out such intention. Mere intention by the owner to place goods in interstate commerce, or the gathering of goods at a depot for that purpose, is not sufficient. It must appear that the goods have entered upon trans-

portation to another state before it can be said that they are in interstate commerce. All circumstances, however, are considered in determining the question. The continuity of shipment and the interruption or noninterruption of the carriage of the goods are matters which should claim one's attention. In all instances with which we are here concerned, except those relating to the National Butter Company shipments, the member creameries furnished the defendant's truck drivers shipping directions covering the movement of the shipment and its continuation after the same was delivered by the defendant to either carriers or forwarders at Minneapolis, St. Paul or Duluth. The shipping directions accompanied the shipment. There was no interruption in the shipments except such as necessarily occurred by reason of the unloading from the defendant's trucks of the goods and the checking in of the same by the continuing carrier, or by the forwarder who attended to the further transportation. The local shipments, that is, the hauls wholly within the State of Minnesota, after the arrival of the goods carried, were continued on toward the points to which the original shippers intended they should go, and the local shipments constituted but steps in the transportation of the goods to their interstate destination.

■ The intention of the original shipper to move these goods across state lines to definite interstate destinations is established in the evidence by the shipping directions issued in connection with each shipment. The movements of the goods by the defendant and other carriers was done in the performance of a preconceived intention to transport said goods to interstate destinations. There was a practical continuity in the movements.

The courts have repeatedly held that such characteristic movements and handling of goods constitute shipments in interstate commerce. United States et al. v. Erie Railroad Company et al., 280 U.S. 98, 50 S.Ct. 51, 74 L.Ed. 187; Hughes Brothers Timber Company v. Minnesota, 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359; Philadelphia & Reading Railway Company v. Hancock, 253 U.S. 284, 40 S.Ct. 512, 64 L.Ed. 907; Baltimore & Ohio Southwestern Railroad Company v. Settle et al., 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189; Meyers v. Railroad Commission, 218 Cal. 316, 23 P.2d 26, decided June 1, 1933; Buckingham Transportation Co. of Colorado, Inc., v. Black Hills Transportation Co., et al., 66 S.D. 230, 281 N.W. 94, decided Aug. 13, 1938; Railroad Commission of Ohio v. Worthington, 225 U.S. 101, 32 S.Ct. 653, 56 L.Ed. 1004; Wm. E. Rush Common Carrier Application, M. C. C., Volume 17, 661, decided August 9, 1939.

■ The fact that several carriers participated in the movement, that different modes of transportation were used, and that rebilling from intermediate points was required, does not destroy the continuity of movement, nor does it destroy its interstate character. See Hughes Brothers Timber Company v. Minnesota, supra.

In the early case of Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 477, 29 L.Ed. 715, the court said that exportation is not begun "until they [logs] are committed to the common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state."

It is interesting to note that in the case of Magann v. Long's Baggage Transfer Co., Inc., D.C., 39 F.Supp. 742, the plaintiff, a truck driver operating a mail truck in the city of Lynchburg, Virginia, and carrying the mail from the Postoffice to the railroad station, was held to be engaged in interstate commerce because mail going from one state to another was carried in the truck, and the truck driver was denied the benefits of the Fair Labor Standards Act, while in Thompson v. Daugherty, D.C., 40 F.Supp. 279, it was held on a similar state of facts that the plaintiff was entitled to the benefits of the Fair Labor Standards Act, and did not come within the exceptions in Section 13(b) (1).

In the Rush Common Carrier Application, supra, the Interstate Commerce Commission dealt with a somewhat analogous situation to that before the Court, and the Commission, after reviewing its decision and those of the Supreme Court, came to the conclusion that local hauls of ore delivered to an interstate carrier constituted movements in interstate commerce.

There can be no question but that any services rendered by Dallum and Huddleston in the operation of the defendant's trucks, where the same transported commodities across state lines, cannot be regarded as coming within the provisions of the Fair Labor Standards Act of 1938.

■ The Interstate Commerce Commission has power to establish the qualifications and maximum hours of service of employees engaged in the operation of trucks in interstate commerce. With reference to the Sebeka, Northwest Dairy Forwarding and Terminal hauls, the bills of lading covering the shipments involved in said hauls were issued by the defendant for the local transportation. However, accompanying said shipments were instructions for the continuation of the shipment of said commodities beyond the state lines of Minnesota. Thus instructions were presented either to the railroad company, water carrier or other forwarding company, and in said instructions the ultimate destination and the consignee were named.

■ As to the National Butter Company hauls, two periods are involved. During the first period, the merchandise was delivered to the National Butter Company at Minneapolis or St. Paul, at stations of said Company at the Freightways Terminal or Minneapolis Cold Storage Terminal, or at the Soo Line Railway. St. Paul or Minneapolis were not the ultimate destinations of this butter delivered to the National Butter Company, prior to February 1, 1940. It was the intention of the member creamery, the defendant and the National Butter Company that the butter should go forward from St. Paul and Minneapolis to Dubuque, Iowa. There was no interruption in said movement.

The plaintiffs contend that the haul of the butter from the member creamery to Minneapolis and St. Paul was in intrastate commerce, because there was no through arrangement, nor was any provision made for the carriage of said butter from the originating creamery to Dubuque, Iowa; that the shipments were separate, and that the title to the butter had passed to the National Butter Company at Minneapolis.

Contentions similar to these were made in Texas & New Orleans Railroad Company v. Sabine Tram Company, 227 U.S. 111, 33 S.Ct. 229, 234, 57 L.Ed. 442, but the court held that the transportation was interstate and not intrastate, and said:

"The determining circumstance is that the shipment of the lumber to Sabine was but a step in its transportation to its real and ultimate destination in foreign countries. In other words, the essential character of the commerce * * * should determine. It was to supply the demand

of foreign countries that the lumber was purchased, manufactured, and shipped, and to give it a various character by the steps in its transportation would be extremely artificial."

See Railroad Commission of Ohio v. Worthington, etc., supra; Baltimore & Ohio Southwestern Railroad Company v. Settle, et al., supra.

Obviously, the railroad yards or the terminals at St. Paul or Minneapolis were not the intended destination of the butter. It was Dubuque, Iowa, and the haul of the defendant's truckers from the originating creamery to St. Paul or Minneapolis was but the first step in the haul to Dubuque, Iowa, and a part of the haul in interstate commerce.

After February 1, 1940, the National Butter Company established a distributing plant at St. Paul, Minnesota. Deliveries were made by the defendant from the originating creameries to this plant. After receipt of the butter at the distributing plant it was graded, cut and made into prints, and prepared for reshipment. The plant at St. Paul was a distributing center. Apparently it was the plan and intention of the National Butter Company to store the butter at St. Paul until such time as transportation thereof to customers could be made. No further movement of any particular part to any particular person was contemplated. Delivery depended upon the demands of the customers of the National Butter Company.

The language of the court in Atlantic Coast Line Railroad Company v. Standard Oil Company, 275 U.S. 257, 48 S.Ct. 107, 110, 72 L.Ed. 270, is apropos:

"There is no destination intended and arranged for with the ship carriers in Florida at any point beyond the deliveries from the vessels to the storage tanks or tank cars of the plaintiff. * * *

"The plaintiff's whole plan is to arrange deliveries of all of its oil purchases on the seaboard of Florida, so that they may all be there stored for convenient distribution in the state to the 123 bulk stations and to fuel oil plants in varying quantities according to the demand of the plaintiff's customers, * * *."

■ The purchase of butter by the National Butter Company subsequent to February 1, 1940, was not in response to any particular previous requisition therefor. It

cannot be successfully maintained that local drayage service constitutes a part of interstate commerce, where there is no intention on the part of the original consignor, the trucker or the consignee, to continue the transportation beyond state lines. It is my opinion that it must be held that this butter came to rest at the plant of the National Butter Company at St. Paul, Minnesota, there to await the demands of customers of said Company. In such a situation, the haul of the butter to the distribution plant in St. Paul would be commerce entirely within the state, and the services rendered by the plaintiffs in connection with such transportation would be covered by the Fair Labor Standards Act of 1938.

As to all other services rendered in the transportation of commodities or merchandise, the transportation was of an interstate character.